# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES A. BRYANT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 2:04-0022** |
| **v.** | ) | **Judge Nixon / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"). The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 7. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 11. Plaintiff has filed a Reply. Docket Entry No. 12.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed his application for Disability Insurance Benefits on May 14, 2001, alleging

Case 2:04-cv-00022   Document 13   Filed 04/20/06   Page 1 of 31 PageID #: 1

that he had been disabled since December 14, 1998, due to "discogenic and degenerative" back

disorders and "[o]rganic mental disorders" (*see, e.g.,* Docket Entry No. 5, Attachment ("TR"),

pp. 27), as well as memory loss, concentration difficulties, depression, anxiety, panic attacks,

impulse and anger control, and psychiatric disorders with suicidal ideations (Docket Entry No. 8,

p. 2). Plaintiff's application was denied both initially (TR 27-28) and upon reconsideration (TR

29-30). Plaintiff subsequently requested (TR 39-41) and received (TR 298-325) a hearing.

Plaintiff's hearing was conducted on June 12, 2003, by Administrative Law Judge ("ALJ"), John

P. Garner. TR 298. Plaintiff and Vocational Expert, Dr. Gordon Doss, appeared and testified.

*Id.* Plaintiff's wife, Deborah Bryant, also appeared and testified. *Id.*

On October 9, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR

10-20. Specifically, the ALJ made the following findings of fact:

> 1. The claimant meets the nondisability requirements for a period of disability and disability insurance benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since December 14, 1998.
>
> 3. The claimant has the following severe impairments: an adjustment disorder, degenerative disc disease, and a cognitive disorder.
>
> 4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

2

6.    The claimant has the residual functional capacity to lift and/or carry 25 pounds frequently and 50 pounds occasionally; sit for a total of about 6 hours in an 8 hour workday; stand and/or walk for a total of about 6 hours in an 8 hour workday; frequently climb, balance, stoop, kneel, crouch, crawl, push, pull, or reach.  There are no limitations in the ability to understand, remember, and carry out very short and simple instructions; remember locations and work-like procedures; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; work in coordination with others; make simple work-related decisions; ask simple questions or request assistance; respond appropriately to supervisors and coworkers; maintain socially appropriate behavior; be aware of normal hazards; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. There are marked limitations in the ability to understand, remember, and carry out detailed instructions; and to interact appropriately with the general public.

7.    The claimant is able to perform his past relevant work as an auto assembler.

8.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

TR 19-20.

On November 24, 2003, Plaintiff timely filed a request for review of the hearing decision.

TR 8-9.  On January 29, 2004, the Appeals Council issued a letter declining to review the case

(TR 5-7), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).

If the Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive.  *Id.*

3

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to "discogenic and degenerative" back disorders, and "[o]rganic mental disorders" (TR 27), as well as memory loss, concentration difficulties, depression, anxiety, panic attacks, impulse and anger control, and psychiatric disorders with suicidal ideations (Docket Entry No. 8, p. 2).

On December 14, 1998, following a tractor-trailer accident, Plaintiff was admitted to Tri-County Baptist Hospital with "scalp contusions" and "back and neck muscle strain."  TR 254-261.  On December 15, 1998, Plaintiff complained of nausea and vomiting, and Dr. Jeffrey Weiss ordered a CT scan of his brain, the results of which were normal.[1]  TR 256.  Plaintiff received medications, and was told not to work either "until evaluated by Company M.D.," or after a certain number of weeks.[2]  TR 261.

On December 17, 1998, Dr. Toney B. Hudson of the "Occupational Health Center" treated Plaintiff.  TR 273-274.  Dr. Hudson reported that Plaintiff had lost consciousness after his tractor-trailer accident; that he had been transported by ambulance to a hospital in LeGrange, KY; and that he had been discharged that same night.  TR 273.  Dr. Hudson reported that the night of Plaintiff's discharge, he "developed chills, vomiting, and diarrhea, and also then have had [*sic*] an intestinal virus," and that Plaintiff had been readmitted to the hospital.  *Id.*  Dr. Hudson recounted the hospital's evaluation that Plaintiff's CT scan was normal, and he stated

---

[1]Other records from December 15, 1998 are illegible because of the poor quality of the copies.  TR 257-260.

[2]The record is unclear with regard to the specific number of weeks.  TR 261.

4

that he concurred with the analysis. *Id.* Dr. Hudson noted that Plaintiff had not taken any of his prescribed medications on the day of the evaluation. *Id.* Dr. Hudson also discussed Plaintiff's complaints of "residual pain"; "pain over the anterolateral lower right ribs"; and "mild neck discomfort and occasional right sided headache." *Id.* Dr. Hudson noted Plaintiff's "mental slowness." *Id.* A physical examination revealed that Plaintiff had bruised ribs, full range of motion in the neck, "minor posterior cervical neck tenderness," and "minor resolving scalp hematoma." TR 273-274. Dr. Hudson opined that Plaintiff "should be ready for commercial driving" by December 21, 1998. TR 274-275; 277. At this examination, Dr. Hudson also noted that Plaintiff's had sprained his knee on August 6, 1998, but that an MRI had indicated a "bone bruise but no significant lesion that would be expected to cause permanent consequences."[3] TR 276.

On December 21, 1998, Plaintiff received treatment at "Centra Care" for "concussion"; "abd. contusion"; "hip pain"; and "chest wall tenderness." TR 263-264. Plaintiff was determined to be able to return to work at "Safety Kleen." TR 265-266. On December 28, 1998, Plaintiff was diagnosed with "memory disturbances" in addition to "chest pain." TR 267-268.

On January 6, 1999, Dr. Alan F. Bachrach composed a letter to Mr. Todd Hite at "Safety-Kleen" concerning Plaintiff's evaluation and ability to work following his tractor-trailer accident. TR 285-287. In this letter, Dr. Bachrach recorded his impression that Plaintiff's complaints "could represent a postconcussive syndrome," and recommended that Plaintiff should not operate any vehicles. TR 287.

---

[3]Plaintiff's MRI of his right knee occurred on August 25, 1998, and revealed a "[s]mall joint effusion with bone bruising involving the medial femoral condyle. No evidence of a meniscal or ligamentous tear" and "[c]hondromalacia." TR 276.

Case 2:04-cv-00022   Document 13   Filed 04/20/06   Page 5 of 31 PageID #: 5

On January 11, 1999, Dr. Bachrach reported that Plaintiff had a "[n]ormal awake EEG" (TR 142-143), and ordered an MRI of Plaintiff's brain that revealed "[m]ild mucous membrane thickening in the maxillary sinuses" (TR 144).

On January 28, 1999, Dr. Bachrach wrote to Mr. Todd Hite at "Safety-Kleen, Inc.," and indicated that Plaintiff manifested "a lot of anger and irritability" that might be manageable with medication. TR 141. The record contains a "Return to Work" certificate that instructed Plaintiff to "continue with no driving and 'light duty.'" TR 140.[4]

On January 29, 1999, Dr. James C. Wardlaw conducted an eye examination for Plaintiff. TR 128.[5]

On February 18, 1999, Dr. Bachrach wrote to Mr. Hite concerning Plaintiff's follow-up examination. TR 291-292. Dr. Bachrach recorded that Plaintiff's behavior "continue[d] to be anxious," and that his optometrist had revoked his commercial driver's license because of his "depth perception problem." TR 291. Dr. Bachrach stated that Dr. Lavin could "help in this regard," and that Plaintiff could perform "limited duty other than driving in the meantime." TR 292. Dr. Bachrach's progress notes, also from February 18, 1999, indicated that Plaintiff had had to change medications, and that he had failed a depth perception test. TR 138.[6]

On March 29, 1999, Dr. Patrick J. Lavin composed a letter to Dr. Bachrach, after Plaintiff's consultation at the "neuro-opthalmology" clinic. TR 130-132. Dr. Lavin recorded that Plaintiff then worked as a tractor-trailer driver and had "intermittent blurring of vision," but

---

[4]TR 288-289 is duplicated at TR 141 and 140.

[5]There is a duplicate of this record at TR 283.

[6]There is a duplicate of this record at TR 293.

6

that his "main problem" was insomnia.  TR 130.  Plaintiff's behavior during the examination was characterized as "bizarre" and his interaction with his wife "unusual."  *Id.*  Dr. Lavin stated that Plaintiff became "very agitated" and "began to scratch his skin" during a "visual field examination."  *Id.*

Dr. Lavin recorded Plaintiff's account of an automobile accident in Lagrange, Kentucky, during which "his vehicle rolled over" and "the trailer jackknifed [*sic*] and landed on the cab."  TR 130.  Dr. Lavin reported that Plaintiff stated that he had "been very depressed since the accident," and that he spent "a lot of time at home."  TR 131.  Plaintiff's "system review" revealed that he had experienced headaches, shaking while sleeping, double vision while reading, frequent falls, poor balance, and "significant features of depression."  *Id.*  Plaintiff also experienced numbness in his right foot, but Dr. Lavin noted that this may have started before the accident.  *Id.*  Dr. Lavin's impressions were that Plaintiff had a "[c]losed head injury by history"; "[r]elatively normal strereopsis"; "no objective neuro-opthalmological signs"; and "[p]sychiatric disorder with suicidal ideations."  *Id.*  Dr. Lavin also noted, however, that "the possibility of malingering is raised" because of Plaintiff's "unusual" and "obstructive" behavior.  *Id.*  Dr. Lavin referred Plaintiff to the emergency room for an "urgent evaluation," because he had threatened to shoot himself or his dog.  TR 132.

On April 1, 1999, Dr. Bachrach wrote another letter to Mr. Hite, in which he explained that Plaintiff was "very anxious," that he had tried to secure psychiatric care for Plaintiff, and that, "it is very unclear to me whether a head injury with brief loss of consciousness could have

7

caused the type of symptoms of which he is complaining."[7]  TR 135-136.

Dr. James E. Seeley treated Plaintiff on April 14, 1999, for a left ear lesion, nausea, and vomiting.  TR 284.  Dr. Seeley recorded that Plaintiff manifested, among other conditions, "[a]nxious depression."  *Id.*

On June 11, 1999, Dr. Bachrach wrote a letter to Nurse Jackie Augustine, in which he opined that, "as of April 1, 1999, from a neurologic standpoint [Plaintiff] would be able to return to light duty," excluding any work driving a tractor-trailer.  TR 134.

On July 2, 1999, upon referral from a workers compensation carrier, Dr. W. Garrison Strickland consulted with Plaintiff.  TR 160-161.  Dr. Strickland reported that Plaintiff had told him that his "biggest problem is falling down."  TR 160.  After interviewing Plaintiff and his wife, Dr. Strickland recorded Plaintiff's impatience, decreased libido, forgetfulness, tremulousness in bed, and his tendency to get "angry easily."  *Id.*  Dr. Strickland's impression was that Plaintiff had a "mild closed head injury with brief loss of consciousness," and was "showing evidence of post-concussion syndrome with marked behavioral change."  TR 161.  Dr. Strickland characterized these changes as "out of proportion to underlying brain injury," and he noted "no evidence of orthostatic hypotension or other reason for his falls."  *Id.*  Dr. Strickland characterized Plaintiff's psychiatric condition as an "urgent" problem.  *Id.*

On August 23, 1999, Dr. Strickland wrote a letter to Nurse Augustine, recommending that Plaintiff undergo a psychiatric evaluation if Dr. Pamela M. Auble concurred.  TR 159.

On November 1, 1999, Dr. Auble conducted a "neuropsychological evaluation" upon

_____

[7]A progress note from Dr. Bachrach, dated April 1, 1999, is partially obscured.  TR 137.  There are duplicates of TR 135-137 at TR 294-296.

8

referral from Dr. Strickland and Genex Services/Crawford and Co. TR 166-176. Dr. Auble interviewed Plaintiff and his wife, and discussed Plaintiff's tractor-trailer accident. TR 166-167. Dr. Auble recorded Plaintiff's report that he had suffered from "mental problems," "nervousness," and "visual disturbances" since his accident. TR 167. Dr. Auble also recorded Plaintiff's treatment with Drs. Bachrach, Lavin, and Strickland. TR 167-169. After Plaintiff took numerous cognitive and psychological tests, Dr. Auble assessed the results and determined that Plaintiff's scores indicated "inconsistent effort." TR 171-173. Dr. Auble concluded that Plaintiff should continue to see a psychiatrist, but that he did not need "treatment for the cognitive effects of the head injury," because his history revealed a tendency "to magnify symptoms at times." TR 174. Dr. Auble found that Plaintiff's level of disability from a "psychological standpoint" was "none," and that his level of disability from a "neuropsychological standpoint" was "unknown." TR 175. Dr. Auble also assessed Plaintiff on the "Weschler Adult Intelligence Scale-III" and the "Weschler Memory Scale-III." TR 176. Dr. Auble found that Plaintiff had a "full scale IQ" of 69, a "performance IQ" of 70, and a "working memory index" of 78. TR 176.

On January 13, 2000, Plaintiff had a follow-up appointment with Dr. Strickland, who noted Dr. Auble's findings and recorded that Plaintiff was "markedly anxious" and had "difficulty" with questions. TR 158. Dr. Strickland noted his concern that Plaintiff might "jeopardize his safety and the safety of others," and he recommended that an evaluation take place "as soon as possible." *Id.*

On January 27, 2000 and November 10, 2000, Dr. Frank B. Jones treated Plaintiff for complaints of "blurry vision," concluding that Plaintiff needed glasses "mainly for his near

9

vision."  TR 279-281.  On an evaluation dated January 27, 2000, Dr. Jones recorded that he had

difficulty administering a refraction test because Plaintiff had "psychological problems that

inhibits [*sic*] refraction."  TR 282.

On February 22, 2000, Dr. J. William Varner evaluated Plaintiff at Maples Psychiatric

Group.  TR 145-150.  Dr. Varner noted that Plaintiff's medical reports indicated a "lack of

objective findings consistent with his reported symptoms," that the neurology report attributed

conditions to psychiatric reasons, and that "None of the providers [who had treated Plaintiff] had

found that the severity of symptoms in their area of expertise were of such severity as to interfere

with his ability to return to work or to limit his driving."  TR 146.  Dr. Varner's impressions

were: "Axis I: Possible malingering.  Adjustment Disorder with mixed emotional features by

history"; "Axis II: Deferred"; "Axis III: Closed head injury with Post-Concussion Syndrome by

history"; "Axis IV: Currently not working, pending litigation"; and "Axis V: GAF presently is

undetermined due to the noture [*sic*] of the patient's responses."  TR 148.  Dr. Varner suggested

that Dr. Auble evaluate Plaintiff to determine whether or not he was "malingering."  TR 149.

Dr. Varner concluded that Plaintiff had "no permanent impairment or restrictions."  TR 150.

On May 4, 2000, upon referral from Dr. Varner, Dr. Auble completed an "Independent

Psychological Evaluation" of Plaintiff.  TR 164-176.  Dr. Auble found that Plaintiff's "score on

the DS scale" indicated that he was "denying even normal emotional weaknesses or problems."

TR 164-165.  Dr. Auble further found that Plaintiff had conflicting tendencies: "though he may

magnify his cognitive problems, he tends to minimize his emotional problems."  TR 165.  Dr.

Auble concluded that Plaintiff had "an adjustment disorder with mixed emotional features that is

under fairly good control with medication." *Id.* On May 19,[8] Dr. Auble affirmed that she could not "make comment of [Plaintiff's] ability to manage his/her own funds," because of Plaintiff's "malingering." TR 162-176.

On September 12, 2000, Dr. Joseph A. Jestus treated Plaintiff for his complaint of "[l]eft leg pain and weakness," and recommended an MRI scan. TR 153-154. Plaintiff's MRI revealed "[a]cute left S1 radiculopathy with pain, weakness, reflex changes and numbness secondary to left sided L5/S1 disc extrusion." TR 153; 155. Dr. Jestus noted that Plaintiff could not "drive his truck because of weakness in his left foot," and because of "difficulty using the clutch with it." TR 154. On September 22, 2000, Dr. Jestus recorded that he had suggested surgery for both Plaintiff's back pain and knee pain, but that Plaintiff wanted to try physical therapy before surgery. TR 152.

On November 17, 2000, Dr. Strickland conducted a follow-up examination on Plaintiff, finding that he was "able to work," and could "drive and do other activities related to his work without restrictions or accommodation." TR 157.

From December 28, 1999 to February 19, 2001, Dr. Clarence L. Jones treated Plaintiff for numerous complaints and conditions, including back pain, "malignant hypertension," "radiculopathy of his left lower extremity," and "tennis elbow."[9] TR 217-218. Plaintiff underwent two scans of his back; one indicated "slight disc space narrowing at the L5/S1 level," and the other indicated "[m]ild facet disease" and "early osteophytic spurring." TR 220-221.

_____

[8]The handwritten year on this record is partially illegible, but appears to be either 2000 or 2001. TR 163.

[9]The handwritten notes from these dates are partially illegible. TR 217-218.

11

On May 1, 2001, Dr. Jones opined that Plaintiff had "organic brain syndrome" and "[m]anic depressive disorder," both of which were caused by his December 1998 tractor-trailer accident. TR 215-216. On May 2, 2001, Plaintiff underwent laboratory work, which revealed that Plaintiff had "hypothyroidism" and "high cholesterol." TR 219.

From May 21, 2001 to September 6, 2001, Dr. Jones treated Plaintiff for "sinusitis, otitis, pharyngitis, and the flu." TR 211-214. On June 6, 2001, Dr. Jones completed a form on behalf of DDS, indicating that Plaintiff was capable "of managing his/her own funds if awarded benefits." TR 210. During a July 3, 2001 examination, Dr. Jones characterized Plaintiff's description of his headaches as "consistant [*sic*] with that of a migraine headache." TR 212.

On July 19, 2001, Mr. Stephen Hardison conducted an examination on behalf of DDS, which was cosigned by Dr. William Sewell. TR 177-182. Mr. Hardison indicated that, during his evaluation, Plaintiff was "restless and jumpy," and that he "seemed somewhat frustrated with some tasks involved on the intelligence testing." TR 177. Also during this evaluation, Plaintiff reported "difficulty with his temper" (TR 177), and his wife "reported this is a drastic change from the way he was previous to the head injury" (TR 178). Mr. Hardison recorded Plaintiff's medications, as well as Plaintiff's "hypothyroidism." TR 178. Plaintiff was found to have an IQ of 69, which placed him into the "upper mental retardation classification of intelligence" (TR 179), and he was found to be "functionally literate" (TR 180). Mr. Hardison's impressions were: "Axis I: 310.1 Personality change due to head trauma; 294.9 Cognitive Disorder NOS; 300.00 Anxiety Disorder NOS"; "Axis II: 071.09 No diagnosis or condition"; "Axis III: Status post head

12

trauma, hypothyroidism, ruptured disc in back."[10]  TR 181.  Mr. Hardison assessed Plaintiff's

abilities as follows:

> His concentration and attention skills appeared somewhat limited
> and he did report difficulty with sustained concentration and
> forgetfulness.  Social interaction skills are somewhat adversely
> affected by his emotional status with anxiety and he does tend to
> have some temper outbursts.  He does appear to have some
> significant cognitive related difficulties and may have difficulty
> remembering and carrying out instructions in a work-setting
> consistently.  He should be able to take appropriate precautions
> regarding normal hazards.  He likely could travel independently,
> although his wife did report he has some periods of confusion.
> The prognosis at this point for him to sustain and maintaining [*sic*]
> full time employment is rather poor.  To get disability based on
> any medical difficulties would need assessment by a physician.

*Id.*  Mr. Hardison determined that Plaintiff would need "some assistance" in his ability to

manage funds.  *Id.*

On July 25, 2001, Dr. Donita Keown evaluated Plaintiff on behalf of DDS.  TR 182-184.

Dr. Keown recorded Plaintiff's history, noting his "ruptured disk," and "pain and discomfort at

the lumbar spine, radiating in the left leg, which he states goes numb, particularly with weight-

bearing or when he lays on a solid surface."  TR 182.  Dr. Keown noted that Plaintiff often gave

an "answer unrelated to the question given," and needed "reassurance throughout the exam to

follow verbal instructions."  TR 183.  After the examination, Dr. Keown found Plaintiff's

"[r]ange of motion is intact in both upper and lower limbs."  *Id.*  Dr. Keown concluded that

Plaintiff's "organic brain disorder" was his "most limiting problem."  TR 183-184.  Dr. Keown

opined that Plaintiff "could sit, stand or walk up to 6 hours in an 8-hour day, routinely lift 10

---

[10]Mr. Hardison's evaluation does not contain an Axis IV or Axis V impression.  TR 177-
181.

pounds, [and] episodically lift up to 20 pounds." TR 184.

On August 10, 2001, Dr. Regan completed a Psychiatric Review Technique Form ("PRTF") regarding Plaintiff.[11] TR 189-202. Dr. Regan determined, "RFC Assessment Necessary," and based this determination upon the listing "12.02 Organic Mental Disorders." TR 189. In describing the "Organic Mental Disorders," Dr. Regan found that Plaintiff manifested "[m]emory impairment," "[d]isturbance in mood," and a disorder "that does not precisely satisfy the diagnostic criteria above." TR 190. Dr. Regan did not indicate that Plaintiff had symptoms of any of the other listings included on the PRTF. TR 190-198. Plaintiff was found to have "mild" limitations in his "restriction of activities of daily living" and in his "difficulties in maintaining social functioning." TR 199. Plaintiff also had a "moderate" degree of limitation in his "difficulties in maintaining concentration, persistence, or pace." *Id.*

Also on August 10, 2001, Dr. Regan completed an Residual Functional Capacity Assessment ("RFC") for Plaintiff. TR 185-188. Dr. Regan assessed Plaintiff as "markedly limited" in his "ability to understand and remember detailed instructions," his "ability to carry out detailed instructions," and his "ability to interact appropriately with the general public." TR 185-186. Plaintiff was "moderately limited" in his "ability to maintain attention and concentration for extended periods," his "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and his "ability to respond appropriately to changes in the work setting." *Id.*

_____

[11]Dr. Regan's first name is unknown.

On August 13, 2001, Dr. Mishu[12] completed an RFC (Physical) evaluation for Plaintiff. TR 203-208. Dr. Mishu found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit (with normal breaks) for about 6 hours in an 8-hour workday, and push and/or pull without limitation. TR 204. Dr. Mishu noted that Plaintiff had "L5/S1 disc herniation," and that, "He has refused surgery since 8/00." TR 204-205. Dr. Mishu reported: "Currently he has pain and discomfort radiating into the left leg. C/E findings are positive for decreased motion of the lumbar spine." *Id.* Dr. Mishu found that Plaintiff did not have any postural, manipulative, visual, communicative, or environmental limitations. TR 205-206.

On October 16, 2001, Dr. Denise Bell completed Plaintiff's second RFC (Physical), which was essentially the same as the first RFC (Physical), but differed in that Dr. Bell found that Plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. TR 223. Dr. Bell explained the limitations, stating that Plaintiff had a "ruptured disc," "head inj MVA 3yrs ago," "toe numbness," "migraines," and that "[p]ain reduces lift from 100/50 to 20/10," but that "RFC never lower for any 12 consec mos." TR 224.

Dr. Clarence Jones treated Plaintiff from November 30, 2001 to December 11, 2002. TR 233-237.[13] Dr. Jones' diagnoses included "back pain"; "history of acute brain damage during a wreck"; "morbid obesity"; and "degenerative arthritis." *Id.* Dr. Jones described Plaintiff as "not knowing what's going on as usual" on November 30, 2001 (TR 237); as having an "uneasy

---

[12]Dr. Mishu's first name is illegible. TR 208.

[13]There is a duplicate record at TR 242 and 244-247. The only notes that are not duplicates are two handwritten notes without a date; one references Plaintiff's "brain damage in a tractor trailer wreck" (TR 243), and the other references "upper respiratory" issues (TR 248).

15

personality" on May 15, 2002 and August 22, 2002 (TR 235-236); and as showing "improved condition" and being "stable" on November 25, 2002 and December 11, 2002 (TR 233-234).

On March 27, 2003, Dr. Jones completed a Medical Source Statement form regarding Plaintiff. TR 229-232. Dr. Jones opined that Plaintiff could occasionally lift and/or carry less than10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk for less than 2 hours in an 8-hour workday, and sit for less than about 6 hours in an 8-hour workday. TR 229-230. Dr. Jones found that Plaintiff's pushing and/or pulling was "limited" in both his upper and lower extremities.[14] TR 230. To support his conclusions, Dr. Jones cited an MRI scan that revealed a "left sided L5/S1 disc extrusion." *Id.* Dr. Jones also opined that Plaintiff could never climb and could only occasionally balance, kneel, crouch, crawl, or stoop. *Id.* Dr. Jones found that Plaintiff had "manipulative limitations," including "limited" and "occasional" abilities to perform "reaching in all directions." TR 231. Dr. Jones additionally found that Plaintiff had "environmental limitations," including "limited" exposure to "vibration" and "hazards." TR 232.

Dr. Jones ordered laboratory work on May 23, 2003, and an x-ray of Plaintiff's chest on June 4, 2003. TR 251. Plaintiff's chest x-ray revealed "perhilar pneumonia," for which Dr. Jones prescribed medication. TR 252-253.

### B. Plaintiff's Testimony

Plaintiff testified that he was 48 years old at the time of the hearing. TR 302. Plaintiff stated that he did not know how long he had been married, but recalled that he had three children who were "grown men." *Id.* Plaintiff's attorney asked Plaintiff why he was applying for

---

[14]Dr. Jones did not specify a degree of limitation. TR 230.

16

disability, and he could not initially recall why, but eventually stated: "[h]e said I had some kind of problems in the brain or something." *Id.* Plaintiff testified that he remembered his December 1998 tractor-trailer accident, recounting how he had come upon another accident and: "it was either run over them or run over a cliff. So I just run [*sic*] over a cliff instead of killing them." TR 303. Plaintiff stated that he did not remember going to the hospital, and that his next memory was that someone drove him to a motel. *Id.* He reported that someone took him to the hospital again because he "couldn't quit throwing up." *Id.* Plaintiff testified that, at the time of the accident, he was working for "Laid Law [phonetic] Environmental," with his wife. TR 304. Plaintiff stated that he went back to work after the accident, but that "the supervisors argued and they wouldn't let me drive again." *Id.* Plaintiff testified that he had "been to a lot of doctors," but that he could not recall if he had ever seen a psychiatrist. TR 305.

Plaintiff's attorney asked Plaintiff if he "had trouble remembering things." TR 305. Plaintiff replied, "Sometimes." *Id.* Plaintiff stated that he would get nervous if his wife did not "fill my pill bottles or whatever." TR 305. He added, "If I don't take my medicine I'll get in your face." TR 306. Plaintiff could not recall how long it had been since he had last worked. TR 306.

Plaintiff testified that he mowed the yard, and he would typically "piddle with an old car or truck or something" in his garage. TR 306-307. Plaintiff stated that he did not sleep well because he had to sleep "sitting up," and he explained, "I throw up in my sleep." TR 307. Plaintiff testified that he had inquired about working again, but that he understood that he had to get a "health card" to drive tractor-trailers again. TR 308. Plaintiff affirmed that he would cry unexpectedly. *Id.*

17

## C.  Testimony of Plaintiff's Wife

Plaintiff's wife, Deborah Faye Bryant, testified at the hearing.  TR 309.  Ms. Bryant testified that she was unemployed and studying "[b]usiness and commerce."  *Id.*  Ms. Bryant stated that she used to work at Safety Clean as an accountant, and clarified that "Laid Law" was the same as "Safety Clean."  *Id.*  Ms. Bryant recounted Plaintiff's hospital visit following his tractor-trailer accident, testifying that she was in Chicago at the time of the accident, and had communicated with Plaintiff by telephone.  TR 310.  Ms. Bryant stated that she had remained on the telephone with Plaintiff "most of the night because he couldn't stop throwing up" (TR 310), and that she drove to the hospital to take Plaintiff home (TR 311).

Ms. Bryant reported that, after the accident:

> [Plaintiff] had a lot of bruising on his body and his arms.  His face, his face was all swollen and black.  And he had numerous huge knots on his head. ... He was in a lot of pain and he was disoriented for a while.  And he was having -- he threw up for a couple of days.

TR 311.

Ms. Bryant testified that she did not notice Plaintiff's personality changes initially, and that he had returned to work "after a couple of weeks for two or three days."  TR 311-312.  Ms. Bryant stated that Plaintiff's supervisor had suggested that she "not let him come back to work," and had recommended that Plaintiff consult with a doctor.  TR 312.  Ms. Bryant also testified that she and Plaintiff had begun "to see various doctors," and that she had "started to notice that there was a drastic change in his moods."  *Id.*  Ms. Bryant clarified that Plaintiff had always been "pretty laid back and easy-going," but that he had become "just agitated at everything."  TR 313.  Ms. Bryant testified that doctors had suggested that Plaintiff's condition would improve,

18

describing it as "post-concussion syndrome." *Id.*

Ms. Bryant stated that Plaintiff had begun receiving treatment from a neurologist upon the recommendation of a doctor in Hendersonville, because Plaintiff "couldn't walk straight," and because he "had balance problems." TR 313. Additionally, Ms. Bryant testified that Plaintiff had started to have "emotional problems," for which Dr. Bachrach had recommended medication. TR 314. Ms. Bryant stated that Plaintiff had had a "panic attack," for which Dr. Bachrach had referred Plaintiff to "Centennial Mental Health." *Id.* Ms. Bryant asserted that the mental health evaluators had attributed Plaintiff's problems to his physical symptoms, "not mental problems," and that they had sent him back to Dr. Bachrach. TR 315. Ms. Bryant recalled that Plaintiff had also been referred to another neurologist, Dr. Lavin. *Id.*

Ms. Bryant testified about Plaintiff's "depth perception problems," stating that Plaintiff had experienced trouble with his vision. TR 315. Ms. Bryant recalled "an extensive eye exam," during which the doctor was "shining the bright lights in his eyes"; she testified that this had triggered a "panic attack." *Id.* Ms. Bryant stated that Plaintiff had gone to the emergency room for the panic attack, and that a "resident psychiatrist" had changed his medication prescription because he was "on completely the wrong medication." *Id.*

Ms. Bryant testified that Plaintiff would not take his medication properly if she did not give it to him, and noted that "if there's something he wants to do, change the oil or something, he just won't take it." TR 316. Ms. Bryant stated that, if she would leave overnight, Plaintiff would call her at "all hours of the night" and ask what medications he should take. *Id.* Ms. Bryant asserted that Plaintiff had not been forgetful before his accident, but that, since the accident, he had become forgetful, irritated, and sometimes displayed inappropriate behavior.

TR 317. Ms. Bryant responded that she was not certain if Plaintiff had hallucinations, but recalled that once he had awakened her because he thought that a snake was in the house. TR 318. Ms. Bryant stated that Plaintiff "doesn't drive very far." *Id.*

Ms. Bryant stated that her life had changed since the accident. TR 318. She testified that Plaintiff "used to be independent," but that "he's a lot more dependent on me then [*sic*] what he used to be." *Id.* She added, "I cannot remember the last time he's been [to] the store by himself to do anything." *Id.* Ms. Bryant also stated that Plaintiff used to "pay the electric bill and the water bill and things like that," but that since the accident, he did not "manage money." TR 319.

Ms. Bryant stated that Dr. Jones would not give Plaintiff a "DOT card," and asserted that Plaintiff wanted to get the card from another doctor and start working again. TR 319. Ms. Bryant testified that Plaintiff did not want to attend appointments with Dr. Jones because of a fear of needles, but that he had appointments every three or four months. TR 320. Ms. Bryant recalled an appointment for which she could not be present, and stated that Dr. Jones told her to reschedule it rather than allow Plaintiff to attend the appointment alone. *Id.*

### D. Vocational Testimony

Vocational Expert ("VE"), Dr. Gordon Doss, also testified at Plaintiff's hearing. TR 320-324. The VE classified Plaintiff's past relevant work as a truck driver as "medium" and "semi-skilled" (TR 320); his past relevant work in automobile assembly as "light" and "unskilled" (TR 321); and his past relevant work as a brazing machine operator as "medium" and "skilled," with "no transferable skills" (TR 321).[15]

---

[15]A witness testified at the hearing to assist the VE in making a determination about the level of exertion and skill required for the automobile assembly position. TR 320-321.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 321. Specifically, the ALJ asked whether a hypothetical claimant, with limitations matching Plaintiff's October 16, 2001 RFC could perform "at least the exertional requirements of all past work." *Id.* The VE answered that the hypothetical claimant could perform such work. *Id.*

The ALJ then modified the hypothetical, asking whether a hypothetical claimant with the limitations contained in Plaintiff's March 27, 2003 Medical Source Statement could perform any of Plaintiff's past relevant work. TR 321. The VE responded that such a hypothetical claimant could not perform Plaintiff's past relevant work. *Id.*

The ALJ again modified the hypothetical, asking whether a hypothetical claimant with the limitations contained in Plaintiff's August 10, 2001 RFC, could perform any of Plaintiff's past relevant work. TR 321-322. The VE responded that such a hypothetical claimant could perform only the past relevant work of automobile assembly. TR 322.

The ALJ referenced the findings of Dr. Keown's July 25, 2001 DDS consultation, stating: "Exhibit 10F describes an individual limited to 20 pounds occasional lifting, 10 pounds frequently. Sit, stand, or walk up to six hours in an eight-hour day, and I believe that should be each." TR 332. The ALJ asked the VE if these findings "would describe light work," to which the VE responded that it would describe the "[f]ull range of light and sedentary work." TR 322.

Next, the ALJ recounted the findings of Dr. Hardison's July 19, 2001 DDS evaluation and asked if it indicated a "capability of performing unskilled work," to which the VE responded that it would not indicate such a capability. TR 322-323.

Plaintiff's attorney asked the VE how a "full scale IQ of 69," as assessed by Dr. Auble, would affect Plaintiff's ability to work. TR 323. The VE responded that he could not make a judgment "based on that measure alone." *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the

Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

> (2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

23

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[16] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*,

---

[16]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in finding that Plaintiff's impairments did not meet a listing and in determining Plaintiff's RFC. Docket Entry No. 8. Plaintiff essentially argues that the ALJ's findings were not based upon substantial evidence. *Id.* Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or remanded. *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

**1.  Impairments Meeting Listing Criteria**

Plaintiff argues that his impairments meet the requisite Listing criteria.  Docket Entry No.

8.  Specifically, Plaintiff argues that his mental impairments constitute a disability, and that he

"has a severe impairment of degenerative disc disease caused by a herniated disc." *Id.*

With regard to his mental impairments, Plaintiff maintains: "The guidelines for

evaluating mental impairments caused by cerebral trauma are contained in 11.18.  Listing 11.18

states that cerebral trauma is to be evaluated under 11.02, 11.03, 11.04, and as [*sic*] 12.02, as

applicable.  In the plaintiff's case, Listing 12.02 is applicable." *Id.*

Listing 12.02 states:

> Organic Mental Disorders: Psychological or behavioral
> abnormalities associated with a dysfunction of the brain.  History
> and physical examination or laboratory tests demonstrate the
> presence of a specific organic factor judged to be etiologically
> related to the abnormal mental state and loss of previously
> acquired functional abilities.  The required level of severity for
> these disorders is met when the requirements in **both A and B** are
> satisfied.
>      A.  Demonstration of a loss of specific cognitive abilities or
> affective changes and the medically documented persistence of **at
> least one** of the following:
>           1.  Disorientation to time and place; or
>           2.  Memory impairment, either short-term (inability to learn
>                new information), intermediate, or long-term
>                (inability to remember information that was known
>                sometime in the past); or
>           3.  Perceptual or thinking disturbances (e.g. hallucinations,
>                delusions); or
>           4.  Change in personality; or
>           5.  Disturbance in mood; or
>           6.  Emotional liability (e.g. explosive temper outbursts,
>                sudden crying, etc.) and impairment in impulse
>                control; or
>           7.  Loss of measured intellectual ability of at least 15 I.Q.
>                points from premorbid levels or overall impairment
>                index clearly within the severely impaired range on

26

neuropsychological testing, e.g., the Luria-
Nebraska, Halstead-Reitan, etc.,:
**AND**

B. Resulting in **at least two** of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace
   resulting in frequent failure to complete tasks in a
   timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in
   work or work-like settings which cause the
   individual to withdraw from that situation or to
   experience exacerbation of signs and symptoms
   (which may include deterioration of adaptive
   behaviors).

(Emphasis added.)

Although the record establishes that Plaintiff met the "A" criteria listed above, substantial

evidence supports the ALJ's determination that Plaintiff did not meet the "B" criteria. The ALJ,

in his decision, specifically discussed in great detail the findings of Dr. Talmage, Dr. Bachrach,

Dr. Strickland, Dr. Auble, Dr. Varner, Dr. Jestus, Dr. Wardlow, Mr. Hardison, Dr. Sewell, Dr.

Keown, Dr. Jones, and Dr. Lavine, and he noted:

There have been extensive evaluations since the motor vehicle
accident in December 1998, with none of the many specialists
finding an objective basis for the claimant's reported symptoms....
None of the providers had found that the severity of symptoms in
their area of expertise were of such severity as to interfere with the
claimant's ability to return to work or limit his driving.
Furthermore, each of these physicians (Dr. Strickland, Dr. Auble,
Dr. Bachrach, and Dr. Lavin) had commented on the possibility of
symptom exaggeration or malingering. ... It is significant that
there has been no ongoing psychological treatment.

TR 15-19. The ALJ also discussed, *inter alia*, the hearing testimony and Plaintiff's daily

activities. *Id.* After discussing the record as a whole, the ALJ found:

In applying the "B" criteria for mental impairments, the claimant

27

has a **mild** restriction in the activities of daily living; a **mild** limitation in maintaining social functioning; a **moderate** limitation in maintaining concentration, persistence, and pace; and there have been **one or two** episodes of decompensation. Since the claimant does not have a marked limitation in at least two of these functions or repeated episodes of decompensation, the "B" criteria is not met.

TR 19 (emphasis added).

Because Plaintiff's impairments did not satisfy both the "A" and "B" criteria, as required, the ALJ properly determined that Plaintiff was not disabled under this listing.[17]

With regard to Plaintiff's claim that he has a severe impairment of degenerative disc disease caused by a herniated disc, Plaintiff maintains that he is disabled pursuant to Listing 1.04A. Docket Entry No. 8.

Listing 1.04A states in pertinent part:

Disorder of the spine (e.g., herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in a compromise of a nerve root (including the cauda equina) or the spinal cord.

With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

---

[17] Plaintiff also argues that his impairments met the requirements of Listings 12.05D (Mental Retardation) and 12.08 (Personality Disorders). Docket Entry No. 8. Listings 12.05D and 12.08 contain the same "B" criteria as Listing 12.02. As has been discussed above, Plaintiff has failed to demonstrate that he satisfied the requisite "B" criteria; accordingly, Plaintiff likewise can not demonstrate that he was disabled under Listings 12.05D or 12.08.

28

In the case at bar, the ALJ found that Plaintiff had "severe impairments: adjustment disorder, degenerative disc disease, and a cognitive disorders" (TR 19), but also determined that his conditions did not "meet or medically equal one of the listed impairments" (TR 20). Substantial evidence supports the ALJ's determination that Plaintiff's degenerative disc disease was not of listing level severity. For example, Dr. Keown's July 25, 2001 examination revealed that Plaintiff had a negative straight-leg raising test and no reflex or motor loss. TR 183.

In his decision, the ALJ weighed the listings' criteria against the evidence in the record, and specifically discussed the evidence on which he based his decision. TR 14-19. The ALJ recounted Plaintiff's MRIs, x-rays, and CT scans (TR 17-18), multiple physicians' opinions that Plaintiff might be "malingering," (TR 17), Plaintiff's testimony (TR 17), and the consultative and treating physicians' opinions about Plaintiff's ability to work (TR 14-19). The ALJ chose to fully accredit the opinions of Dr. Bachrach (TR 14), Dr. Strickland (TR 14-15), Dr. Varner (TR 15), and Dr. Keown (TR 16), but not the opinions of Dr. Sewell (TR 16), Dr. Jones (TR 16-17), and Plaintiff (TR 17). This decision is within the ALJ's province.

Because substantial evidence supports the ALJ's determination that Plaintiff's degenerative disc disease was not of listing level severity, this claim fails.

**2. Residual Functional Capacity**

Plaintiff contends that the ALJ erred in determining his RFC, asserting that the ALJ's decision was not supported by substantial evidence. Docket Entry No. 8.

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion," *Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere

29

scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record here is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence." TR 14-19. Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE. TR 17-19. The ALJ noted that Dr. Strickland found that, in July 1999, Plaintiff was able to perform "light" work (TR 14), and that, in November 2000, Plaintiff could work "without restrictions" (TR 15). The ALJ recounted Dr. Auble's psychological evaluation that Plaintiff's "level of disability from a psychological standpoint related to depression and anxiety was rated as none," and Dr. Varner's conclusion that he found no "objective evidence of a significant psychopathology which would limit, interfere, or restrict the claimant's ability to return to work." TR 15.

The ALJ further discussed and analyzed the evidence, recording a consultative's physician's conclusion that Plaintiff's "[p]rognosis to sustain and maintain full time employment was poor" (TR 16), and Dr. Jones' conclusion that Plaintiff could not perform full-time, sedentary work (TR 18). The ALJ explained that he did not find Dr. Jones' conclusion "supported by the record as a whole." TR 18.

While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability (TR 16), it is also true that much of the evidence (TR 14-19) supports the ALJ's determination that Plaintiff had an RFC to "perform his past relevant work as an auto assembler" (TR 19-20).

As has been noted, the reviewing court does not substitute its findings for those of the

Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387.  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273).  The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

### IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

Case 2:04-cv-00022   Document 13   Filed 04/20/06   Page 31 of 31 PageID #: 31